## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,               CRIM. NO. 19-20498

              Plaintiff,               HON. PAUL D. BORMAN

v.

ALEX CASTRO, et al.

              Defendants.

_____/

## GOVERNMENT'S RESPONSE AND BRIEF IN RESPONSE TO DEFENDANTS' JOINT MOTION FOR SPECIFIC DISCOVERY [45]

Defendants have filed what alleges to be a Joint Motion for *Specific* Discovery. In reality, they have cast an incredibly wide net with this fishing expedition, and the majority of their demands are anything but specific. Frequently, they seek "any and all" documents regarding a general subject matter from "any time" that may be in the possession of "any governmental agency." The Court should deny a large majority of these requests at this time.

Many of the requests simply fall outside the scope of what Rule 16 requires. Others are seeking early *Jencks* materials or fishing for potential *Brady* materials. Witness statements will be provided as required a reasonable time before they testify to permit the defense to prepare, and the United States is well aware of its

1

obligations under *Brady* and will provide any such materials as they are discovered as required by law.

Some of Defendants' requests may be appropriate, if limited in time or scope and to the events relevant to this case, but instead the defense paints with far too broad of a brush in its requests, seeking, in some cases, years' worth of documents.

Furthermore, a large number of the requests are premature. The Department of Justice ("DOJ") has not made a decision whether to seek the death penalty in this case. Until that decision is made, extensive discovery related to mitigation is not necessary or required. The mere fact that the case is undergoing DOJ's internal review process, which includes the opportunity for input from the defense before a decision is made, does not open the doors to all of those possible materials.

Perhaps most importantly, Defendants request numerous documents and reports which contain explicit details regarding the inner working of Bureau of Prisons ("BOP") facilities. Knowledge of this information outside of the BOP will jeopardize the security of the facilities, their staff, and other inmates, as well as severely frustrate the ability of the BOP to adequately control, investigate, and secure the inmate population. Given the early stage of this case (pre-death penalty decision), and the extreme sensitivity of much of this information, the Court should deny Defendants' request at this time. Should some of those materials need release in the future, an extremely restrictive protective order should be granted permitting

2

only defense counsel to view the documents and restricting any further dissemination.

The United States has produced, and will produce, documents responsive to the Defendants' demands, as detailed below.  Any such production does not indicate that the United States is adopting the Defendants' position that the Defendants' are entitled to receive such documents in discovery.  In many instances, these productions constitute broader discovery production than is required by the law, but is being produced nonetheless.

## BACKGROUND

Defendants Alex Castro, Jason Kechego, and Adam Wright are charged with one count of First-Degree Premeditated Murder, in violation of 18 U.S.C. § 1111, one count of Conspiracy to Commit First-Degree Premeditated Murder, in violation of 18 U.S.C. § 1117, and three counts of Assault With Intent to Commit Murder, in violation of 18 U.S.C. § 113(a). Adam Wright is further charged with two counts of Assaulting a Prison Guard, in violation of 18 U.S.C. § 111.

Well before Defendants' arraignment, in a spirit of cooperative good faith, the United States provided defense counsel with approximately 600 pages of discovery, including each defendant's criminal history, inmate incident reports, inmate data, FBI 302's, prison official interviews, medical records, a newspaper article, photos of the deceased victim, photos of the defendants and photos of

Milan FDC.  In terms of the guilt phase of the trial, there is minimal discovery outstanding to date.

Previously defendants each filed a discovery motion, which were all stricken by the Court for failure to comply with local rules and confer with counsel for the Government, among other reasons.  (R. 42: Order).  On October 25, 2019, counsel for the United States met with representatives for each defendant and reviewed their numerous discovery demands in their original motions, indicating its position for each demand.  The United States indicated that it would meet some of the demands, and advised that responsive records were non-existent for other demands.  With respect to the remaining demands, the United States noted its objections.  Nonetheless, after that meeting, Defendants have simply turned around and filed nearly the exact same discovery motion as previously filed, with little to no acknowledgment of the United States' position as to any particular request.

On October 31, 2019, Defendants filed the instant Joint Motion for Specific Discovery, which contains 129 "specific" discovery demands.  (R. 45: Joint Mot. for Specific Discovery, PageID 540-86).  Defendants' motion contains some requests that are reasonable, but many more that are not.  It is largely an overly broad form motion, which casts an unreasonably broad fishing net.  The United States will address each discovery demand below, noting whether it will produce

4

such discovery, if it exists, and identifying any specific objections to producing said discovery.

## OVERVIEW OF APPLICABLE LAW

Unlike broad civil discovery, criminal discovery is relatively constricted, and circumscribed by three rules: (1) Federal Rule of Criminal Procedure 16; (2) The Jencks Act, 18 U.S.C. § 3500 (codified in Federal Rule of Criminal Procedure 26.2); and (3) the doctrine set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *See United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988) (in most criminal prosecutions, these rules "exhaust the universe of discovery to which the defendant is entitled"); *see also United States v. Hart,* 760 F. Supp.653, 660 (E.D. Mich. 1991) (if the information requested is covered by both the *Brady* and the Jencks Act, the government need not disclose the information until the witness has been subject to direct examination). "[D]iscovery afforded by Rule 16 is limited to the evidence referred to in its express provisions." *Presser*, 844 F.2d at 1285. As for the *Brady* doctrine, it "did not create a constitutional right of pre-trial discovery in a criminal proceeding." *Id*. at 1284 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).

In the first instance, the question of disclosure is generally left to the district court's discretion. *United States v. Sharp*, 778 F.2d 1182, 1187 (6th Cir. 1985) (internal citations omitted). The United States acknowledges its discovery

obligations under Rule 16, *Brady* and its progeny, and the Jencks Act, and will

continue to comply with same.  Accordingly, an order from this Court directing

such pretrial disclosure is unnecessary.  *See United States v. Watson*, 787 F. Supp.

2d 667, 673 (E.D. Mich. Apr. 19, 2011) ("Courts have concluded that the

government's assurance that it is aware of its obligations under Rule 16 . . . is

sufficient, and does not compel pre-trial discovery."); *see also United States v.

Hogg*, No. 13-CR-20890, 2014 WL 1328170, at *3 (E.D. Mich. Apr. 2, 2014)

(denying the defendant's motion for pretrial disclosure of impeachment evidence

where the government was aware of its obligations and agreed to turn over *Giglio*

material fourteen days before trial); *United States v. Pegross*, No. 05-CR-80949,

2007 WL 1771542, at *2 (E.D. Mich. June 15, 2007) ("The Court will not compel

pre-trial discovery where, as here, the Government has conceded that it is aware of

its obligations under Rule 16, *Brady*, and *Giglio*; and Defendant fails to establish

that any of these rules require disclosure of the requested material at this time.").

　　　　Moreover, Defendants' general claim that their requests are supported by the

"extraordinary breadth of the factors relevant to the determination of whether to

impose, or seek, the ultimate sentence of death and counsel's duty to make

informed and strategic decisions concerning what evidence should be presented

after thorough investigation," (R. 45: Joint Mot. for Specific Discovery, PageID

575), misapprehends the law and superimposes amplified standards pertaining to

the Federal Death Penalty Act sentencing scheme.  Defendants' arguments relying on their right to mitigation in capital cases ignore the important fact that a decision has not yet been made as to whether or not to seek the death penalty against them. This is not yet, and may not ever be, a capital case.  Thus, Defendant's citations to case law in cases where the decision has already been made to seek the death penalty are inapposite and premature.  As detailed below, Defendants have no right to pre-authorization discovery.  The capital cases cited to be Defendants are distinguishable, among other reasons, by virtue of the fact that they involved cases where the government *had* noticed its intention to seek the death penalty.

Further, the Supreme Court has never held that the distinction between the death penalty and other available sentences confers additional rights upon a capital defendant or mandates that the fundamental rules generally applicable to criminal cases should be revisited or enhanced.  To the contrary, countless aspects of capital trials are indistinguishable from their non-capital counterparts.  The nature of the right to counsel, for instance, is not altered in capital cases, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("For purposes of describing counsel's duties . . . Florida's capital sentencing proceeding need not be distinguished from an ordinary trial."), nor is the analysis for the admissibility of evidence.  *See Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) ("We established that the 'meaning of relevance is no different in the context of mitigating evidence

7

introduced in a capital sentencing proceeding' than in any other context.") (*quoting*

*McKoy v. North Carolina*, 494 U.S. 433, 440-41 (1990)).

Relatedly, Defendants rely on this justification to request detailed information relating to the BOP generally, the release of which would present significant security risks. At the outset, the United States is well aware of its *Brady* obligation to provide the defense with all exculpatory information regarding guilt or punishment and it honors that obligation. The United States, however, does not agree with Defendants that the BOP's policies, practices, and procedures in any way exculpate them for their gruesome, premeditated, and vicious murder of a weaker, smaller inmate.  Moreover, many of Defendants' broad requests seek information relating to the BOP's policies generally.  These policies relate to the procedures, practices, and guidelines for inmate classification, disciplinary determinations, supervision of sex offenders, and security-threat-group classifications.  The release of this information—particularly in the form of Defendants' request for "any and all documents"—would present immediate security threats within the BOP's facilities and would risk significant harm to the safe, secure, and orderly operation of these facilities.

Likewise, Defendants' requests for information relating to cooperating witnesses presents similar safety concerns.  The United States is also aware of its obligations under the Jencks Act.  Although not required to under the Act, the

United States will provide all Jencks Act materials to defense counsel at a reasonable time before trial.  Presently, Defendants cannot show that disclosure of this information is essential to their defense.  More importantly, the early release of this information would vitiate an important function of the Jencks Act—the protection of potential government witnesses from threats of harm or intimidation before testifying at trial.

## DEFENSE MOTION FOR SPECIFIC DISCOVERY

Defendants' motion for specific discovery sets forth 129 specific demands (many of which include sub-parts), broken into eight categories: (A) Discovery related to the charged offenses specifically; (B) Discovery of information related to the alleged victims; (C) Discovery related to the Defendants; (D) Discovery related to the Bureau of Prisons generally; (E) Discovery related to FCI Milan; (F) Discovery regarding witnesses working with the government or providing information to the government; (G) Issues regarding discovery already produced that is redacted; and (H) Ongoing disclosures.

## RESPONSE TO DEMANDS

Defendants' discovery demands will be categorized as follows for the purposes of this response:[1]

---

[1] Many of the demands fall under multiple categories.  Due to the breadth and scope of the Defendants' motion, the United States has made a diligent effort to categorize its responses to aid the Court in applying the legal principles discussed

(1) requests which the government has already fulfilled or will fulfill in the near future (subject to certain limitations including the exclusion of *Jencks* materials or other non-discoverable items);

(2) requests which the government is not obliged to fulfill at this time pursuant to Rule 16 or the Jencks Act, but which it may be at a later date;

(3) items which the government is not required to provide at this time as a decision to seek the death penalty has not been made;

(4) items which are not discoverable under Rule 16, the Jencks Act, or *Brady*, and therefore should not be ordered produced;

(5) requests that cannot be fulfilled because the requested items do not exist; and

(6) Items the release of which are a serious danger to institutional security.

In addition to the above categories, there are other specific objections the government has to the productions of certain items for other reasons as argued below.

Requests and responses are detailed below and are referenced by category letter and paragraph number as indicated on the defendants' motion, and where

---

herein; however, given the limited time and space in which to respond, as well as the overlapping nature of many of the demands, it simply is not possible or practical to enumerate every single reason why every single demand should be denied.  Thus, for example, several items throughout Section E of the Defendants' motion may not exist, but have not been listed individually in this response as not existing, as there are other reasons they should not be produced even if they did exist.

necessary, additional explanation is provided.  Detailed legal arguments on specific

issues follow this section.[2]

### 1. Requests That The United States Has Already Fulfilled Or Will Fulfill In The Near Future.[3]

- A.1. Tour, photo, and video FDC Milan

    - The United States will permit a tour of the East Unit, but due to specific security concerns, objects to permitting photography and video "without limitation."  The United States offers to have staff take photographs and video as directed by defense counsel, subject to possible redaction prior to release, or alternatively to provide detailed 3D scanned data of the East Unit as explained in detail below.  The United States will also provide a drawing of the East Unit.

- A.2.c. Written reports by FBI, SIS, or other BOP Personnel

    - Several reports have already been produced, and additional responsive reports will be produced.

- A.2.d. Division of labor between FBI and SIS documents

    - The United States will produce a memorandum of understanding dated 11-21-1996.

---

[2] Additionally, many of Defendants' requests would take excessive amounts of time to collect and the process to collect all of the requested information would be unduly burdensome on the BOP, particularly given Defendants' incredibly broad requests and the fact that the information is not easily located by the BOP.  For example, Defendants' requests in D. 54, E. 63, E. 71-73, E. 90, and E. 111.  The data requested is not indexed or stored in a manner that would permit easily identifying any responsive documents, and instead would require manually searching large volumes of documents.  Also, some are not electronically stored. For those documents that are electronically stored, it would be necessary to create new software to search and locate responsive documents.

[3] The United States will disclose these requested items once a protective order is in place.

- A.4. Roster of all inmates housed at FDC Milan on January 2, 2019.

  - A roster for the East Unit (where the murder occurred) will be provided.

- A.5. Photos of all inmates at FDC Milan 10/1/18 – 1/5/19

  - Photographs of each inmate in the East Unit on January 2, 2019 will be provided, subject to a protective order prohibiting dissemination of copies to defendants to protect the other inmates and potential witnesses.

- A.7. FCI Milan SIS office documents

  - Incident reports and Form 583-Report of Incident will be produced.

- A.12.a – A.12.c. SIS, BOP Intelligence, and SIU documents regarding defendants

  - Documents pertaining to the facts of this case will be produced

- A.12.d – A.12.g. SIS, BOP Intelligence, and SIU documents regarding victims

  - Documents pertaining to the facts of this case will be produced

- A.13. Documents relating to SIS briefings or presentations to BOP and FCI Milan staff regarding the charged offenses

  - The United States previously produced responsive documents, including those submitted by Milan for the After Action Review, and additional incident reports will be produced.

- A.17. All crime scene video

  - All crime scene video that exists was previously produced, except video recording of a staff debriefing that occurred shortly after the incident, which will also be produced.

- B.26. Photos of victims

  - Crime scene photos were already produced.  Additional photos from BOP will be produced.

- C.33 – C.35. BOP Central Inmate Files for Defendants, Administrative Detention Orders and Disciplinary Segregation Orders

  - Portions thereof which are discoverable for each defendant will be produced individually, but may take a substantial amount of time due to the size and locations of the files, especially those with prior BOP sentences.

- C.36. Photos of Defendants "within the possession, custody, or control of the government"

  - Many already produced, others, if they exist, and are in the possession of BOP or FBI, will be produced.

- C.37. Jail calls of Defendants

  - Each defendant's own calls from Milan around the time of the murder, which have been first screened by a filter team not involved in this case for any attorney-client information, will be produced (From approximately 12/26/18 – 1/3/19).

- C.38. Letters and e-mails of Defendants

  - Each defendant's own e-mails from Milan around the time of the murder, which have been first screened by a filter team not involved in this case for any attorney-client information, will be produced (Covering roughly through 1/8/19).

- E.112. Correctional services rosters will be produced, if Defendants will agree to a protective order limiting dissemination to defense counsel only. Other departments do not keep daily lists of staff assigned to work or are irrelevant.

**2. Requests which the government is not obliged to fulfill at this time pursuant to Rule 16 or the Jencks Act, but which it may be at a later date.**

- A.2.a. Correspondence between FBI and BOP

- A.2.b. Handwritten notes by FBI, SIS, or BOP Personnel

- A.2.c. Written reports by FBI, SIS, or other BOP Personnel

- A.6. Documents relating to interviews of inmates

- B.19 – B.25; B.27 – B.31. – Various requests related to the victims

  - The government is aware of and will fulfill its *Brady* and *Giglio* obligations.  Any other information, including PSRs is not discoverable or possible *Jencks* materials.

- F.116 – F.127. Various documents related to cooperating witnesses, informants, or other witness statements

  - To the extent these exist, they are plainly covered by the *Jencks* Act.

- F.128. Unredacted copies of all documents

  - Any redactions that have been made are to either protect the identity of a witness, ensure the safety, security, and orderly operation of the federal prisons, contain personal identifying information, or are information which is not discoverable.  Those that are covered by the *Jencks* Act will be turned over a reasonable time before trial.

**3. Items which the government is not required to provide at this time as a decision to seek the death penalty has not been made.**

- A.7. FCI Milan SIS office documents

- A.12.a – A.12.c. SIS, BOP Intelligence, and SIU documents regarding defendants

    o Any documents contained therein beyond the relevant incident are not relevant at this time in this case

- D.42 – D.50; D.53 – D.55. Numerous documents related the Bureau of Prisons generally

    o Not only is this request premature, but it is overly burdensome and irrelevant unless a decision is made to seek the death penalty.

- E.56 – E.115. Numerous requests related to FCI Milan

    o Not only is this request premature, but it is overly burdensome and irrelevant unless a decision is made to seek the death penalty.

   **4. Items which are not discoverable under Rule 16, the Jencks Act, or *Brady*, and therefore should not be ordered produced.**

- A.2.a. Correspondence between FBI and BOP

- A.2.b. Handwritten notes by FBI, SIS, or BOP Personnel

- A.2.c. Written reports by FBI, SIS, or other BOP Personnel

- A.2.d. Division of labor between FBI and SIS documents

    o This would reveal internal investigation techniques, and are not discoverable.

- A.4. Inmate and housing roster for West Unit, where nothing occurred in this case, is not material to this case at all.

- A.5. Photos of inmates in the West Unit are not at all relevant to this case. While it is not burdensome to provide this for one particular day, to do so for 96 days would require running 96 roster reports and then gathering photos for each inmate for each day and is not practical, nor necessary.

15

- A.7. FCI Milan SIS office documents

  o Form 586-After Action Review Report is included in this, which consists of an internal review of actions that took place.  Parts of the report consisting of factual information is contained in other productions that have been or will be made.

- A.9. After Action Report

  o See response to A.7 above.

- A.10. Documents related to DOJ's internal deliberations and process whether to seek the death penalty

  o The internal deliberative process of the Department in determining whether to seek the death penalty is confidential and not discoverable.

- A.11. Conversations related to DOJ's internal deliberations and process whether to seek the death penalty

  o The internal deliberative process of the Department in determining whether to seek the death penalty is confidential and not discoverable.

- A.12.a – A.12.c. SIS, BOP Intelligence, and SIU documents regarding defendants

- A.12.d – A.12.g. SIS, BOP Intelligence, and SIU documents regarding victims

- A.12.h – A.12.j. SIS, BOP Intelligence, and SIU documents regarding particular Security Threat Groups

- B.19 – B.25; B.27 – B.31. – Various requests related to the victims

  o The United States is aware of and will fulfill its *Brady* and *Giglio* obligations.  Any other information, including PSRs is not discoverable or possible *Jencks* materials.

- C.32 – Defendant's prior PSR's

16

- C.33 – C.35. BOP Central Inmate Files for Defendants, Administrative Detention Orders and Disciplinary Segregation Orders

    o Portions of these files are not discoverable.

- C.37. Jail calls of Defendants

    o Some of the defendants have been housed in county jails, and therefore, such records are not in the government's possession as they have not been obtained by the FBI or U.S. Attorney's Office.

    o Defense counsel is free to obtain any calls of their clients which are not being produced per #1 above, as they are not in the government's possession as they have not been obtained by the FBI or U.S. Attorney's Office, by issuing subpoenas or obtaining any necessary court order directed to the appropriate institution.

- C.38. Letters and e-mails of Defendants

    o Same issues as C.37.  The FBI, who investigated this case, nor the U.S. Attorney's has requested these items and does not possess them, and the defense has other means available to obtain them.

- C.39 – C.41. Documents related to designation, classification, and transportation of the Defendants, transfer records, records obtained by the DSCC

- D.42 – D.50; D.53 – D.55. Numerous documents related the Bureau of Prisons generally

- E.56 – E.115. Numerous requests related to FCI Milan

    o Many of the requested documents have no relation to this case or are from an excessively broad time frame, involve third party inmates, relate to all of FCI Milan (which is a separate and distinct facility from FDC Milan).  Some of these overlap with other documents covered in #1 above which have been or will be produced, as it pertains to this particular incident.

o Some of these items, such as certain BOP policies are publicly available on BOP's website at bop.gov. Defendants are invited to request any specific institutional supplements related to FDC Milan.

- F.128. Unredacted copies of all documents

  o Any redactions that have been made are to either protect the identity of a witness, contain personal identifying information, constitute *Jencks* materials, or are information which is not discoverable.

5. **Requests that cannot be fulfilled because the requested items do not exist.**

- A.3. No mass interviews were done and therefore no such forms exist.

- A.7. FCI Milan SIS office documents

  o There was no "SIS Investigation" so there is no Inmate Investigation File Check List.

  o There are no Disciplinary Hearing Officer reports are responsive to this request.

- A.8. Board of Inquiry Reports

  o No Board of Inquiry was appointed by the Directory in this matter, therefore no such reports exist.

- A.14. OIA and OIG Documents

- A.15. BOP disciplinary records related to the charged offenses.

- A.16. Recorded radio communications

- A.18. Autopsy video

- D.53.a – D.53.b. "Constitutions" and membership requirements for specific STGs.

**6. Items the release of which are a serious danger to institutional security.**

- A.7. After Action Review Report

- A.9. After Action Report

- A.12.a – A.12.c. SIS, BOP Intelligence, and SIU documents regarding defendants

- A.12.d – A.12.g. SIS, BOP Intelligence, and SIU documents regarding victims

- A.12.h – A.12.j. SIS, BOP Intelligence, and SIU documents regarding particular Security Threat Groups

- A.13. Documents relating to SIS briefings or presentations to BOP and FCI Milan staff regarding the charged offenses

- C.33 – C.35. BOP Central Inmate Files for Defendants, Administrative Detention Orders and Disciplinary Segregation Orders

    o Portions of these files contain separatee related information and other security related information

- C.39 – C.41. Documents related to designation, classification, and transportation of the Defendants, transfer records, records obtained by the DSCC

- D.42 – D.50; D.53 – D.55. Numerous documents related the Bureau of Prisons generally

- E.56 – E.115. Numerous requests related to FCI Milan

## ARGUMENT

### 1.  A Majority of Defendants' Requests are Overbroad and Immaterial.

Defendants seek many records over significant periods of time, ranging anywhere from several months to years before Christian Maire's murder on January 2, 2019.  The Indictment in this cases alleges a conspiracy that existed during a limited period of time: from December 5, 2018 to January 2, 2019.

As an initial matter, the United States previously indicated to defense counsel its objection to the scope of many of the discovery requests as extending to FCI Milan and are not limited to FDC Milan.  Defendants have defined "FCI Milan" in their request to include both FCI Milan and FDC Milan, yet the two are separate facilities.  The events in this case took place in FDC Milan, specifically in the East Unit of FDC Milan.  Thus, for any requests that are not specifically limited to FDC Milan, the United States generally responds that the request is overbroad and seeks documents that are irrelevant.

Similarly, many of Defendants' specific requests for discovery relate to items that are immaterial.  Rule 16 establishes guidelines for pretrial production by the government, as well as reciprocal discovery by the defendant, of limited categories of material evidence, including items "material to preparing a defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  "[D]iscovery afforded by Rule 16 is limited to the evidence referred to in its express provisions." *Presser*, 844 F.2d at 1285.

Although Rule 16 mandates disclosure of certain relevant evidence, "vague and conclusionary (sic)" arguments lacking "any degree of particularly" as to how the requested information may support a defense is insufficient to establish a right to disclosure under Rule 16. *United States v. Clark*, 957 F.2d 248, 252 (6th Cir. 1992); *see also United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990) (conclusory allegations of materiality do not satisfy Rule 16; a defendant must present facts that tend to show the government possesses information "helpful to the defense"). In other words, Rule 16(a)(1)(E)(i) requires a *prima facie* showing of materiality. *See United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) (internal citation omitted). "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case . . . there must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Id.* In short, Rule 16 cannot be used as an end run to obtain information that is not discoverable under *Brady* and its progeny. *See United States v. Gonzalez-Montoya*, 161 F.3d 643, 650 (10th Cir. 1998) (noting that the government need not disclose evidence that is only possibly useful to the defense but not likely to have changed the verdict).

In their joint motion, Defendants acknowledge that the United States has provided initial discovery relating to the events on January 2, 2019. (R. 45: Joint

Mot. for Specific Discovery, PageID 563).  Defendants, however, seek much broader discovery than was provided.  Indeed, Defendants acknowledge that their requests are "numerous and wide-ranging."  (*Id.*, PageID 575).  Yet Defendants' support for their broad requests is insufficient to warrant disclosure.  Defendants' mere assertion that the requested items "are relevant to the death penalty authorization decision because they relate to the circumstances of the alleged offense" lacks specific reasoning as to the relevance and materiality of the requested information.  (*Id.*, PageID 574).  In fact, Defendants concede that "the requested items are *potentially* relevant to each individual Defendant's statement of mind at the time of the alleged offense and therefore *may* be highly relevant to whether the death penalty should be authorized."  (*Id.*, PageID 573) (emphasis added).  Defendants' conclusory statements of the *potential* relevance of their "numerous and wide-ranging" requests are insufficient to trigger disclosure under Rule 16.

For example, Defendants request all telephone recordings and letters and emails from any of the Defendants.  (*Id.*, PageID 548).  Although Rule 16(a)(1) provides that the government must disclose a defendant's oral and written or recorded statements, it provides specific limits.  Specifically, a defendant's oral statements are limited to those made in response to interrogation by a person the defendant knew was a government agent if the government intends to use the

22

statement at trial.  Fed. R. Crim. P. 16(a)(1)(A).  Similarly, the government must

disclose any *relevant* written or recorded statement by a defendant that is within

the government's possession, custody, or control.  Fed. R. Crim. P. 16(a)(1)(B)(i)

(emphasis added).  Yet Defendants fail to identify any meaningful limit to their

request.  Instead, they request all jail calls, letters, and emails, of each Defendant,

without any limit as to the date, with whom the communication involved, or any

connection to the indictment charges.  This is just an example of Defendants'

incredibly broad requests that lack any sense of materiality to the charged offenses.

In addition, the United States will give each Defendant his own calls or

emails from around the date of the murder, after a filter team review to remove any

privileged communications.  These particular calls were received from the BOP as

a result of a subpoena.  The United States acknowledges its ongoing discovery

obligation under Rule 16 to provide a defendant's *relevant statements that are in*

*its possession* and will continue to do so.  Moreover, the United States has not

subpoenaed anything further, and defense counsel has the ability to subpoena

additional calls or emails should they so desire.  The United States has no

obligation to obtain and review these calls and emails on its own, which are not in

its possession, custody, or control, simply because Defendants request them.

Additionally, *Brady* and *Giglio* require the government to produce evidence

in its possession that is favorable to the defense or that may be used by the defense

for impeachment purposes. *Brady*, 373 U.S. at 87-88; *Giglio*, 405 U.S. at 154-55.

*Brady*, however, does not apply to evidence "available . . . from another source[.]"

*Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008). Defendants' requests include

evidence available to defense counsel from other sources than the government. For

example, Defendants requests for jail calls, emails, and letters, not in the United

States' possession, custody, or control, that are available to defense counsel. These

records are in the possession, custody, or control of the BOP and/or the county jails

where Defendants are being held. After a filter team review, Defendants' calls,

emails, and letters that have already been collected by the FBI—occurring around

the time of the murder—will be provided to each defendant's counsel individually.

The BOP has received preservation requests for certain calls and e-mails, but the

USAO and the FBI have not collected any further calls or e-mails and do not

intend to at this time. If the USAO collects further calls or emails, it will work

with defense counsel on a review process. Until then, defense can obtain the

requested information on its own with a subpoena or court order to the BOP and/or

whichever county jail the Defendant is currently housed. Additionally, the United

States acknowledges its requirement to turn over any of Defendants' relevant calls,

emails, or letters that are in its actual possession, custody, or control, and will

provide the same to defense counsel.

Moreover, the Supreme Court has repeatedly emphasized that *Brady* "is based on the requirement of due process.  Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."  *United States v. Bagley*, 473 U.S. 667, 675 (1985).  Therefore, the government "is not required to deliver [its] entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."  *Id.*

Further, "the government typically is the sole judge of what evidence in its possession is subject to disclosure."  *Id.*  Simply because information may aid a defendant in the preparation of his case does not mean that the prosecution is obliged under *Brady* to disclose it.  *See United States v. Agurs*, 427 U.S. 97, 109 (1976) ("Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of trial, does not establish 'materiality' in the constitutional sense."); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense. We have never held that the Constitution demands an open file policy[.]") (internal citation omitted).

Even in a potential capital case, a defendant must justify discovery requests with a showing of materiality. *See United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (affirming denial of immaterial discovery request for BOP information in a capital case). In *Caro*, a capital defendant requested wide-ranging discovery from the BOP. The court denied as material access to BOP records about inmates confined to a certain unit, incidents of inmate violence in that unit, and all inmate homicides within BOP facilities for the previous 20 years. *See id.* at 618. The Fourth Circuit affirmed, explaining that the defendant failed to establish that the requested information would be favorable to him. *Id.* at 619. Specifically, it found that "[b]ecause [the defendant] can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be 'favorable to [the] accused.'" *Id.* (quoting *Brady*, 373 U.S. at 87).

Similarly here, in connection with Defendants' potential *Brady* requests, Defendants merely speculate as to what the requested information might reveal. As such, Defendants have not justified their requests with a *prima facie* showing of materiality—they fail to show how the requested information will likely alter the quantum of proof against them.

## 2.  The Jencks Act Does Not Require Disclosure At This Time.

The Jencks Act requires the government's disclosure of statements by a government witness that relate to the subject matter of the witness' testimony after the witness has testified on direct examination. If *Brady* or *Giglio* evidence falls "within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence."  *Presser*, 844 F.2d at 1283; *see also United States v. Algie*, 667 F.2d 569, 571 (6th Cir. 1982); *United States v. Carter*, 621 F.2d 238, 240 (6th Cir. 1980).  The production of witness statements and other Jencks Act materials before trial would violate the express terms of the Act.  18 U.S.C. § 3500 ("In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.").

In *Presser*, the Sixth Circuit held that "the government cannot be compelled to disclose impeachment material which would be covered by the Jencks Act relating to any potential government witness, whether it be a witness in the case-in-chief or a rebuttal witness."  844 F.2d at 1285.  It cautioned that "[t]he clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the Government may not be compelled to disclose

Jencks Act material before trial." *Id.* at 1283.  This rule is necessary because "providing the defense with such a broad right of pre-trial discovery would vitiate an important function of the Jencks Act, the protection of potential government witnesses from threats of harm or other intimidation before the witnesses testify at trial." *Id.* at 1285.

The same is true for *Brady* material covered by the Jencks Act.  As the Sixth Circuit has "stated repeatedly, '[w]hen *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure.' " *United States v. Brazil*, 395 F. App'x 205, 215 (6th Cir. 2010) (quoting *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002)).  "If impeachment evidence is within the ambit of the Jencks Act, then the express provisions of the Jencks Act control discovery of that kind of evidence . . . the government may not be compelled to disclose Jencks Act material before trial." *Brazil*, 395 F. App'x at 215.  (quoting *Presser*, 844 F.2d at 1283).  "Put another way: the Jenks [sic] Act trumps *Brady* where impeachment evidence is Jencks Act material." *Brazil*, 395 F. App'x at 215.  The purpose of the criminal discovery rules is to preserve trial rights, thus "so long as the defendant is given impeachment material . . . in time for use at trial," there is no constitutional violation. *See Presser*, 844 F.2d at 1283.  Furthermore, the Sixth Circuit in *Presser* found that any prejudice a defendant may suffer from the disclosure of

28

impeachment evidence during trial can be eliminated by the court ordering a recess. *United States v. Bencs*, 28 F.3d 555 (6th Cir. 1994) (quoting *Presser*, 844 F.2d at 1283-84 (6th Cir. 1988)).

### 3. Defendants' Broad Requests Present Significant Safety Concerns for the BOP.

Additionally, Defendants request extensive information relating to the BOP's policies generally, including the procedures, practices, and guidelines relating to inmate classification, disciplinary determinations, supervision of sex offenders, and security-threat-group classifications. These items would reveal, among other things, intelligence collected on security-threat groups inside of the BOP system, how this the intelligence is collected, and the type of information collected in connection with these threat groups. Defendants also request BOP's internal policies, directives, separatee information. Release of such information would present a clear and immediate danger to the safe and orderly operation of the BOP's facilities, particularly if inmates were to learn of such information. *See* (Ex. 1: Garrow Declaration).

Revealing the details of the operations of a correctional facility puts the safety and security of the institution at risk. This includes the safety of inmates, staff, and the communities in which the facilities are located. Certain demands made by Defendants would produce records that would reveal:

1. Details of the physical structure of Milan FDC;

2. Methods of maintaining the physical security of the FDC (including locks, keys, cameras, checks, monitoring, routines, etc.);

3. Information about weaknesses in institution security;

4. Methods of maintaining an orderly operation to ensure inmate and staff safety;

5. Methods and means of conducting investigations;

6. Methods of collecting intelligence;

7. Content of intelligence collected;

8. How intelligence is synthesized and utilized;

9. Specific procedures/plans for responding to various events occurring at an institution;

10. Information about inmates that could put those inmates at risk of physical harm;

11. Personal information about staff that could be used against them by inmates seeking to do them a variety of harm, or leverage such information to their own benefit; and

12. Information about on-going criminal investigations.

This information is at the very heart of what a correctional facility is designed to accomplish. The interest in maintaining the safety, security, and orderly running of a correctional facility is very significant. Ordering the release of information that could jeopardize that interest should not be taken lightly, and the potential harm from its release should be readily apparent. Any release should only be done after an *in camera* review and subject to a restrictive protective order.

30

Defendants also request an opportunity to view, photograph, video, and use electronic-measuring equipment "without limitation" inside of FDC Milan. (R. 45: Joint Mot. for Specific Discovery, PageID 545). The United States strongly opposes any private photography or videography within the facility, as this also poses significant security concerns. These photos or videos would document security measures inside of FDC Milan: Information such as routes of travel through the buildings, locations of various offices or staff, locations of cameras, types of models of keys and locking mechanisms, control room devices, radios, locations and what types of weapons or non-lethal weapons may be available in the facility, and other information related to the facility's security. To permit defense counsels' limitless photography or video inside the facility would seriously compromise the security of FDC Milan. It could also result in other inmates being photographed or videoed while inside the prison, inmates whose identities and whereabouts may be protected and who have their own privacy interests at stake.

As an alternative to Defendants' request, the BOP has indicated that they would be willing to accompany defense counsel into the facility, and the BOP would take any requested photographs or video, which would then be subject to possible redactions prior to handing over to the defense, in order to protect propriety information regarding facility security. The BOP would further agree not to disclose any information regarding the tour, photographs, or videos to the

prosecution team.  This practice has been successfully used in many other criminal cases.

Additionally, the United States has already provided the defense a number of photographs and videos of the crime scene and the east wing of FDC Milan, where the murder occurred.  During its investigation, the FBI conducted detailed 3D laser scanning of the east wing of FDC Milan, including the interior of cells involved in these crimes, and provided video created from the 3D laser scanning system. Further videos can be created upon request from this system.  Also, upon request, the United States will provide the raw data from these scans to the defense, which would provide very detailed and precise measurements and data about the East Unit at FDC Milan.[4]

The United States requests that the Court deny Defendants' limitless request in light of the significant and immediate security concerns it presents.  The United States submits that, even with a protective order in place, should an inmate see any of the requested information, it could be put to use against the facility and its staff. Given the significant security risks that would result from this request, the Court should deny it.  *See Kirkelie v. Thissell*, No. 1:15-cv-735, 2018 WL 341673, at *1 (E.D. Cal. Jan. 9, 2018) ("[W]here otherwise discoverable information would pose

---

[4] In order to make use of this raw data, the defense may need to purchase proprietary third party software.

a threat to the safety and security of [a] prison or infringe upon a protected privacy interest, a need may arise for the Court to balance interests in determining whether disclosure should occur." ) (collecting cases).

The United States' proposal is reasonable and would permit defense counsel to gather the information they require while still protecting their confidentiality. At the same time, these measures would protect the security of the institution, the inmates housed therein, and the staff.  Should the Court permit any defense photography or video within the facility, the United States respectfully requests a protective order restricting viewing of any photographs or video solely to defense counsel, and that under no circumstances should any of the defendants or anyone outside of the defense team be permitted to view them or use them for any purpose other than the defense of this particular matter.

Relatedly, the Court has not yet ruled on the United States' request for a protective order.  Thus, depending on the scope and expansiveness of any protective order granted by the Court, a more restrictive order may still be necessary regarding materials related to the BOP should the Court grant any of Defendants' specific requests.  Additionally, should the Court require the disclosure of these materials, the United States respectfully requests that the Court first conduct an *in camera* review, so that the Court can determine specifically

what portions, if any, should be disclosed and what restrictions on their disclosure are necessary.

### 4. Defendants Fail to Show that Disclosure of Information Relating to Cooperating Witnesses is Essential to Their Defense.

Defendants' request for compelled disclosure of information relating to cooperating witnesses, *see* (R. 45: Joint Mot. for Specific Discovery, PageID 558-60), is meritless. Defendants have provided no evidence that the disclosure of this information is essential to a fair trial. Additionally, given the nature of the charges at issue, the Court should deny Defendants' request because disclosure would jeopardize the safety of cooperating witnesses and would violate public interest.

Although the Sixth Amendment guarantees a defendant's right to confront witnesses against him, it does not compel the disclosure of a cooperating witness's identity. *Roviaro v. United States*, 353 U.S. 53, 62 (1957). Further, "no fixed rule with respect to disclosure [of a cooperating witness's identity] is justifiable." *Id.* Courts must balance the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* This balance "depends on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

Generally, the government may withhold disclosure of individuals' identity who provide information of criminal activity to law enforcement. *Id.* at 59-60.

The interests protected by this privilege often extend beyond identification of the informer to include, among other things, the informer's location and the precise relationship between the government and the informer. *Sharp*, 778 F.2d 1187. Indeed, "public policy *forbids* disclosure of an informer's identity unless essential to the defense[.]" *Scher v. United States*, 305 U.S. 251, 254 (1938) (internal citations omitted) (emphasis added). Therefore, Defendants bear the burden of showing that disclosure is essential to a fair trial. *United States v. Hanna*, 341 F.2d 906, 907 (6th Cir. 1965); *see also Rugendorf v. United States*, 376 U.S. 528, 534-35 (noting defendant's failure to show that the cooperating witness's name was necessary to his defense).

Relatedly, in *United States v. Moore*, 954 F.2d 379 (6th Cir. 1992), the Sixth Circuit affirmed the district court's refusal to compel disclosure of a cooperating witness. *Id.* at 381. It held that "the burden was on [the defendant] to show how disclosure of the informant would substantively assist his defense." *Id.* (internal citation omitted). Because the defendant "advanced no more than a simple statement that [the confidential informant's] testimony might assist in his defense[,]" disclosure was unwarranted. *Id.* Therefore, "[t]he district court struck the correct balance by denying disclosure of the confidential informant." *Id.* at 382.

Similarly, the Sixth Circuit has held that a trial court abuses its discretion in ordering disclosure of a cooperating witness's identity based solely on defense counsel's unsworn representations that disclosure would be relevant and helpful to the defense. *Sharp*, 778 F.2d at 1187. It "emphasize[d] that it is ordinarily not even appropriate for the trial court to compel the production of the suspected informant for an *in camera* interview unless the defendant has first borne his burden of producing some evidence supportive of his [] defense, and not merely unsworn assertions of his counsel." *Id.* When a defendant fails to meet this burden, a district court may deny the motion without an *in camera* hearing. *United States v. Sierra-Villegas*, 774 F.3d 1093, 1099 (6th Cir. 2014).

Here, Defendants have failed to show that the requested information related to cooperating witnesses is essential to their defense. In fact, Defendants provide no explanation as to why they request this information—far less than the representations that the *Sharp* Court found insufficient to require disclosure.

Moreover, there is an important public interest in nondisclosure of cooperators as a means to protect their safety. *See United States v. Dexta*, 136 F. App'x 895, 904 (6th Cir. 2005). And there is an even greater public interest in protecting cooperators who will also testify as witnesses. Unlike in *Roviaro*, here, the United States may use informants as witnesses at trial. If such a witness were to testify, Defendants would receive any *Brady*, *Giglio* or Jencks materials, hear

the witness testify, and have an opportunity to cross-examine the witness. *See United States v. Perkins*, 994 F.2d 1184, 1188 (6th Cir. 1993) (noting that informants who testify have an important distinction because they are subject to extensive cross-examination, and affirming district court's denial of defendant's request to compel disclosure of the informant's identity in advance of trial).

Further, early disclosure of cooperating witnesses may put their lives in danger. The indictment alleges that Defendants engaged in violent acts, including first-degree premeditated murder of another inmate using a shank inside of a federal detention center. *See* (R. 1: Indictment, PageID 17-31). Because the crimes occurred by inmates inside of a federal detention center, potential cooperating witnesses would also be federal inmates. Indeed, "providing the defense with such a broad right of pre-trial discovery would vitiate an important function of the Jencks Act, the protection of potential government witnesses from threats of harm or other intimidation before the witnesses testify at trial." *Presser*, 844 F.2d at 1285. Therefore, an order to disclose their identities would put their lives in danger and would discourage others from coming forward to provide information and testimony for the public good. Balancing the strong need to protect public interest against Defendants' failure to show how this information is essential to their defense, disclosure relating to cooperating witnesses is

unwarranted. Because Defendants have failed to carry their burden, the Court should deny the motion without an *in camera* hearing.

### 5. Defendants are not Entitled to Third-Party Information held by BOP.

Defendants' requests for information relating to twenty other individuals who are "known sex offenders . . . charged with offenses similar to those of the alleged victims and were in federal custody at or near the time of the charged offenses[,]" (R. 45: Joint Mot. for Specific Discovery, PageID 552), is not only incredibly broad but also untimely. Additionally, such material is not discoverable. Defendants fail to apply any realistic limit to their request. For example: "Requests regarding the individuals identified in this request are <u>not</u> limited to the BOP or FCI Milan but include <u>any</u> facility where the individuals were held or detained." (*Id.*) (emphasis in original). Defendants include similarly overbroad, irrelevant, and immaterial requests relating to the BOP's acceptance, designation, classification, and transportation of sex-offender inmates. *See* (*id.* at PageID 552-53).

As an initial matter, any third-party BOP inmate information is inadmissible in a capital trial. Defendants' argument that this information would be useful to rebut a claim that any Defendant would pose a danger to others in the future is unavailing. (*Id.* at PageID 578). If a future dangerousness aggravator were

alleged,[5]  Defendants fail to identify how this information would be relevant to

rebut the government's potential evidence that *these Defendants* are a future

danger.  Defendants also fail to establish that such information is even admissible

in a capital case.  Indeed, it is not.  *See Jurek v. Texas*, 428 U.S. 262, 276 (1976)

(holding that, in a capital trial, "what is essential is that the jury have before it all

possible relevant information about the *individual defendant* whose fate it must

determine") (emphasis added); *accord Zant v. Stephens*, 462 U.S. 862, 879 (1983)

("What is important at the selection stage is an individualized determination on the

basis of the character *of the individual* and the circumstances of the crime.")

(emphasis added); *see also United States v. Johnson*, 223 F.3d 665, 675 (7th Cir.

2000) ("A mitigating factor is a factor arguing against sentencing *this defendant* to

death; it is not an argument against the death penalty in general) (emphasis added).

None of the requested information relating to third-party BOP inmate information

---

[5] Defendants speculate that the government will allege a future dangerousness
aggravator.  The government acknowledges that such an aggravator is alleged in
many (though not all) capital cases, particularly in prison homicides.  Nonetheless,
because the Attorney General has not yet decided whether to seek the death penalty
against the Defendants, the government has not yet filed a notice of intent to seek
the death penalty which would identify the aggravating circumstances upon which
the government will rely at a potential penalty phase.  *See* 18 U.S.C. § 3593(a)(2).
Thus to make their argument, the Defendants are not only speculating about a
decision which has not yet been made, but are also speculating on a second level
about the aggravating factors that will be alleged.

relates to Defendants or the circumstances of the charged crimes. Therefore, this information is irrelevant to guilt or punishment.

Moreover, Defendants' argument that this information may be material under Rule 16 even if it is inadmissible relies on the assumption that the requested information will lead to discovery of admissible evidence. *See* (R. 45: Joint Mot. for Specific Discovery, PageID 572) (citing *United States v. Holihan*, 236 F. Supp. 2d 255, 260 (W.D.N.Y. Dec. 6, 2002)). Not only is this requested information inadmissible, Defendants fail to show that it will lead to the discovery of admissible evidence.

Relatedly, Defendants' argument that this information "is relevant to the defense investigation and analysis of prison conditions including the BOP's attention, or lack thereof, to the safety of sex offenders[,]" (*id.* at PageID 578), is unavailing. Although the Eighth Amendment and the Federal Death Penalty Act afford Defendants broad rights to present mitigation information, such information must still be relevant to their individualized moral culpability. In other words, it must relate to their personal background, character, criminal history, or the circumstances of their offenses. *See, e.g., United States v. Gabrion*, 719 F.3d 511, 522 (6th Cir. 2013) ("In summary: mitigation evidence is evidence relevant to a reasoned moral response to the defendant's background, character, and crime.") (internal citations and quotations omitted); *see also id.* ("Mitigation evidence . . . is

not an empty concept to be filled by whatever a lawyer or court thinks might

persuade a single juror in a particular case."); *United States v. Fell*, 531 F.3d 197,

219 (2d Cir. 2008) (holding that the broad standards for admissibility of mitigating

evidence do "not mean that the defense has carte blanche to introduce any and all

evidence that it wishes.").  As one district court explained:

> Testimony regarding hundreds or thousands of prisoners in groups, in
> many unidentified prisons, in circumstances that the jury could never
> know precisely, would run the risk of the jury losing sight of its
> obligation to focus on the individual before it, the defendant, his
> character or record, and the circumstances of the offenses.
> Individualized sentencing of a capital defendant is one of the most
> important decisions the jurors will ever make in their own lives and
> testimony regarding generalities of prison invites the jury to make
> decisions based upon group characteristics and assumptions.

*United States v. Taylor*, 583 F. Supp. 2d 923, 943 (E.D. Tenn. 2008), *affirmed by*

*United States v. Taylor*, 814 F.3d 340, 351-63 (6th Cir. 2016) (holding judge did

not abuse its discretion in excluding prison expert testimony).  The Sixth Circuit

noted that "testimony about inmate classification procedures and prison security

was [] not proper mitigating evidence" and that testimony "that inmates on death

row have a low recidivism rate and are statistically no more likely than other

inmates to be dangerous in prison. . . [was] not specific to [the defendant's] crime

or character."  *Taylor*, 814 F.3d at 362.

Although Defendants cite to some district courts which granted third party

BOP discovery requests, other courts have declined to do so.  *See, e.g. United*

*States v. Caro*, 597 F.3d 608, 616-19 (4th Cir. 2010) (affirming district court's

denial of discovery requests for BOP third-party records, including records

regarding inmate on inmate violence, as speculative; defendant wished to prove the

records to its expert to rebut government evidence of future dangerousness), *cert.*

*denied.*, 565 U.S. 1110 (2010); *United States v. Lujan*, No. CR 05-0924 RB, 2011

WL 13210243, *2 (D.N.M. Sept. 7, 2011) (denying request for list of all

documented acts of violence against BOP employees by Barrio Azteca gang

members and a list of all escapes by inmates from BOP facilities in last 5 years

because it was "clearly . . . not 'exculpatory' evidence in the Government's

possession, and is not material to his case for mitigation.").  Further, the fact that

the Defendants have not yet been capitally authorized, combined with the

government's other objects here, support denial of Defendants' discovery motion.

Defendants' broad requests for third-party information from the BOP are irrelevant

to their background, character, and crime.  Because this information has no

relevance to a possible argument about Defendants' future dangerousness, the

Court should deny their related requests.

### 6.  Defendants Cannot Receive Presentence Reports for the Victims and Other Defendants.

Similarly, Defendants are not entitled to the Presentence Investigation

Reports ("PSRs") of the victims or other Defendants. ''PSRs are confidential

reports created by an arm of the court and designed for use by a judge in reaching a

fair sentence.'' *United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016).

They ''occupy a unique position,'' *In re Morning SongBird Food Litig.*, 831 F.3d

765, 773 (6th Cir. 2016), and ''have always been jealously guarded by the drafters

of the federal rules and by the federal courts,'' *United States v. Trevino*, 89 F.3d

187, 192 (4th Cir. 1996). ''The commonly invoked reasons underlying PSRs'

special status are threefold: (1) the defendant's interest in privacy and in

preventing the dissemination of inaccurate information, (2) law enforcement's and

cooperating informants' interest in confidentiality, and (3) the sentencing court's

interest in encouraging the free flow of information during the presentencing

process.'' *In re Morning Song*, 831 F.3d at 773.

Moreover, ''[n]either *Brady* nor the Federal Rules of Criminal Procedure

mandate that a trial court produce a copy of a presentence report concerning a

government witness, prepared for the court, to the defense upon request.'' *United

States v. Sherlin*, 67 F.3d 1208, 1218 (6th Cir. 1995) (emphasis added). A PSR is

not *Brady* material, because it is a report to a court and not evidence suppressed by

the prosecution. *Id.* Additionally, ''presentence reports are not statement of the

defendant within the meaning of Jencks,'' but are ''reports prepared by probation

officers used primarily as an aid to district courts at sentencing'' and contain ''the

government's version of the offense,'' to which defendants rarely object. *United

States v. McGee*, 408 F.3d 966, 973 (7th Cir. 2005). Therefore, the PSRs for the

victims and other Defendants are not discoverable, and the Court should deny this request.  To the extent Defendants seek their own PSRs for prior convictions, they are the records of the court of conviction for those cases, not the records of the government, and therefore the government cannot produce them to Defendants.

### 7.  The DOJ's Internal Process Governing the Decision to Seek the Death Penalty Does Not Entitle the Defendants to Additional Discovery.

Defendants, throughout their motion for specific discovery, have intentionally conflated the Department of Justice's ("DOJ") internal deliberation process relating to whether to seek the death penalty with the penalty phase of a death penalty trial.  No decision has been made as to whether the United States will seek the death penalty in this case.  Thus, although the United States has agreed, as a courtesy, to provide some of the requested items in discovery at this time, many of the requested items are either not discoverable at all or not discoverable unless and until a decision to seek the death penalty is made.

The DOJ's Justice Manual 9-10.000 *et seq.* sets forth the policies and procedures for prosecutions in which the death penalty may be sought.  Although the policies are made publicly available online at justice.gov/jm/justice-manual, by their own terms:

> The Justice Manual provides internal DOJ guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any

44

> matter civil or criminal.  Nor are any limitations hereby placed on
> otherwise lawful litigation prerogatives of DOJ.

J.M. 1-1.2000.  The Sixth Circuit has held that the Justice Manual does not create any substantive or procedural rights for death-eligible criminal defendants.  *See United States v. Myers*, 123 F.3d 350, 356 (6th Cir. 1997) (holding that the Justice Manual "may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter").

In their Joint Motion, Defendants' justification for their "numerous and wide-ranging" specific discovery requests falls short.  *See* (R. 45: Joint Mot. for Specific Discovery, PageID 575).  Defendants rely on the "extraordinary breadth of the factors relevant to the determination of whether to impose, or seek, the ultimate sentence of death and counsel's duty to make informed and strategic decisions concerning what evidence should be presented after thorough investigation."  (*Id.*).  But the DOJ's internal review process is not a triggering event for discovery scheduling.  *See United States v. Furrow*, 100 F. Supp. 2d 1170, 1177 (C.D. Cal. 2000) (holding, in the context of the Sixth Amendment's right to counsel, that the "death penalty authorization process is not a constitutionally critical stage"); *see also United States v. Aguilar*, Case No. 18-cr-119 (R. 168: Order, Page 1) (N.D. Cal. Mar. 1, 2019)).  Defendants cannot cite to any statute, rule of criminal procedure, or other entitlement that supports a right to preauthorization discovery.  *See United States v. Johnson*, 228 F.3d 920, 924 (8th

Cir. 2000) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)).  Therefore, the Court should deny their request for preauthorization discovery regarding potential death penalty mitigation evidence.

### 8. The DOJ's Internal-Deliberations Process of Whether to Seek the Death Penalty is not Discoverable.

Similarly, Defendants' requests relating to the internal-deliberations process are improper.  Such items are protected by the deliberative-process and work-product privileges, and therefore, are not discoverable.  To be protected by the deliberative-process privilege, "a document must be both (1) pre-decisional or antecedent to the adoption of agency policy and (2) deliberative, meaning it must actually be related to the process by which policies are formulated." *Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000) (internal citations and quotations omitted). The Ninth Circuit has held that documents related to the internal-deliberations process—the death-penalty-evaluation form and the prosecution memorandum— are pre-decisional and deliberative documents.  *Id.*  Specifically, it held that, even though the documents at issue included facts and evidence unprotected by the deliberative-process privilege, that factual material was so interwoven with the deliberative material that it was not severable.  *Id.*  (internal citations and quotations omitted).  It also held that the more general work-product privilege also applied to these items.  *Id.*  Accordingly, these items were not subject to discovery. *Id.*  Likewise here, Defendants requests relating to the DOJ's internal-deliberation

46

process are protected by the deliberative-process and work-product privileges.

Therefore, these items are not discoverable, and the Court should deny these

requests.

### 9. The United States Appropriately Redacted the Previously Provided Materials.

In the discovery already provided to Defendants, redactions have been made

for a variety of reasons.  For example, redactions have been made to protect

witness identities, to protect institutional security, to withhold information not

discoverable under Rule 16, *Brady*, or otherwise, and to protect personal-

identification information.  Those portions of any documents that have been

redacted that are *Jencks* materials will provided a reasonable time before trial to

permit the defense to prepare.  Defendants are not entitled to this information

under any of the applicable discovery authorities, and the Court should deny their

request for unredacted copies of these items.

## CONCLUSION

In conclusion, the United States acknowledges its discovery obligations

under Rule 16, *Brady* and its progeny, and the Jencks Act, and will continue to

comply with same.  Therefore, an order from this Court directing such pretrial

disclosure is unnecessary.  Because a majority of Defendants' requests are

overbroad, immaterial, and untimely, the United States requests that the Court

deny Defendants' Joint Motion.  In the alternative, if the Court is inclined to grant

some of Defendants' requests, the United States would ask that the Court first

conduct an *in camera* review of the evidence to specifically determine what is

responsive and presently discoverable.

Respectfully Submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Andrew R. Picek*
ANDREW R. PICEK
DANIELLE K. ANGELI
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
OH 0082121

Dated: November 22, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2019. I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, for uploading and service by electronic notice to counsel and parties authorized to receive electronically Notices of Electronic Filing.

/s/ Andrew R. Picek
ANDREW R. PICEK
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9652
E-Mail: andrew.picek@usdoj.gov
OH 0082121